Filed 10/23/13  P. v. Rosas CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B233478 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA062569) |
| v. | |
| CHRISTOPHER JAMES ROSAS et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County. Cynthia L. Ulfig, Judge.  Affirmed.

Neil Rosenbaum, under appointment by the Court of Appeal, for Defendant and Appellant Christopher James Rosas.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant Ralph Dominic Rosas.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Appellants Christopher James Rosas (Christopher) and his brother Ralph Dominic Rosas (Ralph)[1] appeal from judgments entered against them following their convictions by separate juries of first degree murder (Pen. Code, § 187, subd. (a), count 1)[2] and assault with a deadly weapon (§ 245, subd. (a)(1), count 2). The juries also found true the special circumstances allegation of lying in wait (§ 190.2, subd. (a)(15) and the allegation that appellants used a deadly and dangerous weapon (§ 12022, subd. (b)(1)).

The trial court sentenced appellants to life without the possibility of parole on count 1, plus one consecutive year in state prison on count 2, and one consecutive year in state prison for the weapons use allegation. The trial court imposed various fines and court fees and awarded appellants 853 days of presentence custody credit.

Ralph contends the trial court abused its discretion under Evidence Code section 352 by admitting autopsy and crime scene photographs of the victim. He contends the photographs were inadmissible in that they were cumulative and that their admission violated his federal due process rights. He also contends the admission of a note shown to him by his mother during a jailhouse visit was an error which violated his right to due process. We find no merit to those contentions.

Christopher's counsel has filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and requests that we conduct an independent review of the record. We independently reviewed the record and conclude there are no issues that require further briefing.

The judgments are affirmed.

---

[1]     Because appellants and other individuals share the same last name, we refer to each by their first name, for the sake of clarity. No disrespect is intended.

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL BACKGROUND

**Prosecution Case**

### *Mugsy's Bar*

Christopher and his best friend Louis Campanelli co-owned Mugsy's Bar (Mugsy's) on Soledad Canyon Road in Los Angeles. Mugsy's opened in November of 2005 and Campanelli "breathed the bar." He lived there, and was almost always present at closing time to handle the money transactions. Christopher was at Mugsy's regularly and was not happy that Campanelli lived there. Ralph was also at Mugsy's on a daily basis. Ralph wore silver necklaces with Indian-type jewelry or a feather-like charm. He offered to buy Campanelli's ownership of Mugsy's for $40,000 and was angry that Campanelli refused his offer.

Mugsy's was open daily from 2:00 p.m. until 2:00 a.m. The front door was locked by a deadbolt and only Campanelli and Christopher had the keys to it. The emergency exit was never used. Mugsy's had no telephone land line service and the employees had to use their own cell phones. Christopher kept a collection of knives with big handles and "monster" blades in a locked tool room on the premises.

When Mugsy's opened in November 2005, Christopher hired Cynthia Wilson Rosas (Cindy) to be the head bartender. Cindy dated Christopher for about one and a half months. On February 21, 2006, Cindy married Ralph.[3] Christopher told Cindy on several occasions "that he wanted to get [Campanelli] out of the bar, that [Campanelli] had to go, that he was going to kill [Campanelli]." Savino Pilarski was at Mugsy's every day. He became good friends with appellants and viewed them as his brothers. Ralph told Pilarski he wanted to become a partner in Mugsy's. In January 2006, Christopher told Pilarski that something had to be done about Campanelli. Pilarski understood that to mean Campanelli had to be roughed up or "taken out and killed." Ralph told his first

---

[3]    The ceremony was not valid because Ralph was still legally married to his second ex-wife, at that time. Cindy and Ralph were legally married a year later on February 21, 2007.

ex-wife, Theresa Liechti, that he was angry at Campanelli because Campanelli did not want him as a business partner.

### Murder of Louis Campanelli and Assault on Jennifer Halsworth

On Saturday, February 25, 2006, Jennifer Halsworth, a part-time bartender, worked the day shift from 2:00 p.m. to 8:00 p.m. at Mugsy's. Halsworth had worked at Mugsy's for about two months and had been dating Campanelli for about one month. When her shift ended she took the money which amounted to about $400 from the cash register and gave it to Campanelli, who stored it in a safe in the back office. Christopher and Campanelli were the only people with keys to the safe. Halsworth stayed at Mugsy's after her shift ended. Appellants, Pilarski, Cindy, Shannon Turner (Pilarski's girlfriend and also a former Mugsy's bartender), were also present. Around 11:00 p.m., Halsworth and Campanelli left Mugsy's to go to a party in North Hollywood.

Cindy worked the shift from 8:00 p.m. to closing. She overheard Christopher tell Ralph that "tonight was the night." Ralph explained to her that "tonight was the night they were going to take [Campanelli] out and kill him." Christopher moved his Chevy Blazer to the car wash behind the bar and also re-parked Cindy's car across the street. At approximately 1:45 a.m. on the morning of February 26, 2006, Christopher told Cindy to close the bar early and get all the customers to leave. Christopher locked the front door and Cindy took the money from the register to the back office. While there, she heard a commotion including the sound of breaking glass coming from the bar area. She looked out and saw both appellants wielding crowbars. They were "ripping apart the ATM machine." They broke the hanging lights near the ramp leading up and into the bar. Shortly afterwards they went to the back office and threw things around to make it look like it had been ransacked. Appellants wore extra layers of clothing, gloves, and T-shirts around their faces so that only their eyes showed. Ralph told Cindy their plan was to kill Campanelli when he and Halsworth returned to Mugsy's from the party. Christopher told Cindy to watch the surveillance monitor from the back office and let him and his brother know when Campanelli and Halsworth returned.

4

Around 2:30 a.m., Campanelli unlocked the front door of Mugsy's with his key. Campanelli and Halsworth entered the bar which was dark except for the light from the television screens. Halsworth walked a few steps inside the bar and then waited while Campanelli locked the door. Appellants came out from hiding and struck Campanelli and Halsworth with pool cues. Halsworth was struck on the head five or six times until she fell to the ground. From about five feet away she saw two assailants beating Campanelli. The two assailants called each other "Ben" and "Fred" or "Frank" but the way they used the names led Halsworth to believe the names were fake. The longer she heard the voices, the more she was certain that appellants were the assailants. Halsworth heard the sound of a fire hydrant being sprayed and Campanelli begging his attackers to stop. One of them said, "Check his pulse, I want to make sure that he's dead." When the other responded "He's not dead yet," the beating continued and Halsworth heard stabbing sounds. Halsworth was crying and hyperventilating and one of the assailants stepped on the side of her head and told her to stop breathing or he would "smash [her] head into the ground." A plastic beer crate was placed over her head and she was told not to move. Halsworth heard the assailants banging on the ATM machine and then go towards the back office.

Cindy was in the back office and heard Halsworth scream. She heard the sound of grunting and then Christopher said, "Man, you were supposed to be my best friend." Campanelli groaned and asked, "Chris, is that you?" Christopher told his brother, "Bro, he won't die." Cindy heard Campanelli "pleading for his life gurgling through his blood." After about 20 minutes, Ralph came to get Cindy from the back office and walked her to the front of the bar. She saw Campanelli's motionless body near the front door. Campanelli did not respond when Christopher jumped onto his body. Christopher then shoved the fire extinguisher hose down Campanelli's throat and turned it on. Cindy and appellants exited Mugsy's and Christopher locked the deadbolt.

Halsworth held onto her purse throughout the attack and when she heard the assailants leave she called 9-1-1 on her cell phone. The call did not go through. When

5

she tried to call a second time she heard someone unlock the front door and come inside the bar.[4] She hid the cell phone and remained still underneath the beer crate. Christopher demanded her cell phone and car keys. She responded that she did not have her cell phone but he said, "Yes, you do." Christopher took the car keys and cell phone and locked the front door and left. Halsworth waited for some time to be sure they had left before she got up and ran to the back office. She watched the monitors showing the parking lot and front of the bar to see if anyone was coming back and tried to contact someone over the Internet.[5] When she was unable to pry open the front door, she broke the front window and crawled out through the broken glass. After cutting her hands and knees on the broken glass, she ran onto Soledad Canyon Road.

At 5:30 a.m. on February 26, 2006, Jennifer Stoll was driving to work on Soledad Canyon Road. She saw Halsworth waving for help in the middle of the street. Halsworth appeared scared and hysterical. Stoll stopped and called 9-1-1 and brought Halsworth back to Mugsy's when the police arrived.

### *Police Investigation and Initial Arrest of Appellants*

Los Angeles County Sheriff's Department (LACSD) Deputy Mark Noel was the first to arrive at Mugsy's at approximately 6:00 a.m. in response to the 9-1-1 call. He entered Mugsy's through the broken window and discovered Campanelli's body lying face up inside the door. There was a lot of blood around the body and on the railing wall. A discharged fire extinguisher and broken pool cues were close by. A trail of blood lead from Campanelli to the ATM machine and then continued outside down the sidewalk and into the parking lot of the building next door.

---

[4]     Halsworth's cell phone records indicated that two calls were made to 9-1-1 at 3:04 a.m. and 3:05 a.m. on February 26, 2006.

[5]     An analysis of the hard drive from the computer located in the back office indicated that several attempts were made between 4:03 a.m. and 4:21 a.m. on February 26, 2006, to download a telephone program through "Google.com" and "PChelp911.com."

6

LACSD Homicide Detective Steven Lankford was assigned to investigate the crimes. He observed a lot of blood on the fire extinguisher and a white substance which indicated the fire extinguisher had been discharged on and near the body. A straight-edge knife was found by Campanelli's shoulder and a folding knife by his feet. A necklace with a feather charm was recovered on the floor near a plastic beer crate. A blood trail and partial shoe prints led from the ramp area to the necklace and down the counter of the bar. There was blood on the counter and on an empty knife sheath. The straight-edge knife found by Campanelli fit into the sheath. The bar looked like it had been ransacked but there were no signs of forced entry into the tool room or the back office. Large pry bars and sledgehammers were lying on the ground in front of the ATM machine and Detective Lankford found it strange that robbers would have brought such large tools with them. Detective Lankford did not see pry marks at the cash register or on the safe in the back office and concluded that the perpetrators had access to the cash register and a key to the safe.

Christopher arrived at the bar while Detective Lankford was investigating the crime scene. He appeared nervous and his hands were shaking. His left hand was swollen and he had fresh abrasions on his forehead and right arm. He unlocked the front door with his key which Detective Lankford kept.

Detective Lankford interviewed Halsworth on the afternoon of February 26, 2006. She told him that she believed the assailants sounded like appellants, Christopher and Ralph. She reiterated that belief in a subsequent interview on March 19, 2006, and later told him that she was certain the voices belonged to appellants.

Detective Lankford first met Ralph on February 28, 2006, and noticed that on his right arm he had a feather tattoo which looked similar to the feather charm Detective Lankford recovered from the bar. Ralph had an abrasion on the inside of his right arm and also wore a necklace with an Indian-style pendant.

7

On March 2, 2006, Christopher reported his Chevy Blazer stolen and that the last time he drove it was on February 25 at 9:00 p.m. He told Deputy Noel that both front and back license plates were on the vehicle.

On March 10, 2006, appellants, Cindy, Pilarski, and Turner, were removing property from Mugsy's and placing it in a U-Haul truck, when appellants were taken into custody. On March 14, 2006, appellants were released pending further investigation.

On March 23, 2006, LACSD Deputy Timothy Vander Leek stopped Pilarski who was driving a vehicle with an expired license registration tag. The vehicle was impounded because Pilarski did not have a valid driver's license. Deputy Vander Leek found Christopher's license plate inside Pilarski's vehicle while conducting a routine inventory of its contents.

On March 25, 2006, LACSD Deputy Timothy Hemphill found Christopher's Chevy Blazer in an isolated mountainous area in Val Verde. The ignition had been "punched" out so that the vehicle could be started with a screwdriver or similar tool. Deputy Hemphill had the vehicle towed because it had been flagged by the homicide unit for fingerprinting if recovered.

*Appellants' Rearrest*

On August 15, 2008, Detective Lankford directed that appellants be rearrested. Christopher was arrested in Arizona where he was living at the time. Ralph was arrested in Santa Clarita. Christopher was extradited back to Los Angeles County on August 27, 2008. Beginning on that date, Detective Lankford monitored all of appellants' and Cindy's telephone calls.

*Appellants' Admissions to Others*

**1.    Cindy**

Cindy told appellants many times that "the thing that freaked [her] out the most" was hearing Campanelli "gurgling through his blood, pleading for his life." She lied when first interviewed by Detective Lankford because Christopher had sent her threatening messages stating that if she said anything she "would end up like you know

8

who, gurgle, gurgle, gurgle." Cindy was arrested on August 27, 2008, and charged as an aider and abettor to murder. She agreed to tell Detective Lankford about appellants' conduct and admissions before and after they committed the crimes at Mugsy's.

Appellants arrived at Cindy's trailer on the morning of February 26, 2006, after committing the crimes at Mugsy's. They had changed out of their clothing and Ralph stated they had dumped their blood-soiled clothing in the back of an El Camino truck owned by Gary Scott Weightman. Ralph said he hid until the victims came into the bar and then he whacked Halsworth over the head with a pool stick and placed a plastic crate over her head. Christopher stated his Chevy Blazer was "full of Lou's blood and he was planning on having it stolen." He called Pilarski who was to have a gang member "torch" the Blazer after making it look like it was stolen. Christopher told Cindy how he attacked Campanelli. He stated he "stabbed him in the side, that he slit his throat ear to ear, he broke his neck, broke his back, beat him, and bashed his head in with a fire extinguisher." Appellants stated they tried to make the crimes "look like a robbery gone bad." Christopher devised a story that he, his brother, and Cindy would tell the police. They were to say they closed the bar as usual and all three of them went to Cindy's house to discuss problems with their relationships.

A few days later, Ralph and Cindy drove to Weightman's house and pulled a bag of bloody clothing from Weightman's car. Ralph told Cindy on a later date that he burned the clothing. Both appellants and Cindy regularly discussed the details of the murder and assault to keep their stories straight, and Christopher wanted the three of them to get a tattoo to show their solidarity.

Cindy visited Christopher in Arizona prior to his arrest. He gave her a suicide letter in which he claimed responsibility for the crimes. Ralph took the letter from Cindy and put it in his safe. Ralph told Cindy while they were in lockup together that he had burned the letter. Appellants told Cindy that if they stuck with the story they devised they would get through it and "walk on this murder."

9

Pursuant to an agreement that she would testify honestly at trial in exchange for a three-year sentence, Cindy pleaded guilty to voluntary manslaughter. At the time of trial, her divorce from Ralph was pending.

### 2. Savino Pilarski

On February 25, 2006, Campanelli accused Pilarski of sleeping with Halsworth and an argument ensued. Christopher told Pilarski "You gotta go, you gotta go; you are going to mess everything up tonight." Pilarski left before midnight. The following day at around 6:00 or 7:00 a.m. Christopher called Pilarski and told him Campanelli had been murdered. Christopher asked Pilarski to have his friend "Frost," a Val Verde gang member, get rid of and torch his Chevy Blazer as soon as possible. Pilarski agreed and drove Frost to where Christopher had parked the Blazer.

Pursuant to Christopher's request, Pilarski spoke to Halsworth numerous times in the days following the murder and assault at Mugsy's. He sought out the information she told the police and relayed it to Christopher. He tried to convince her that appellants did not hurt Campanelli. Christopher told Pilarski that Campanelli "fought hard" and the murder did not go as planned. After his initial arrest in March 2006, Christopher talked about leaving town. A few weeks later Christopher found out that his Blazer was at a Sheriff's impound yard and had not been burned.

Ralph also called Pilarski on February 26, 2006, and told him to get rid of all the drugs and drug paraphernalia at Cindy's house and at his house and apartment because he anticipated that he and his brother were going to be arrested. Ralph discussed the details of the murder with Pilarski on numerous occasions. He said he stabbed Campanelli "over and over again" and his brother tried to break Campanelli's neck because he would not die. He described how Campanelli pleaded for his life and "gurgled" when he choked on his own blood. Ralph also said that he and his brother wore masks and disguised their voices while committing the crimes. In June 2007, Christopher asked Pilarski and Ralph to visit him in Arizona. Christopher was unhappy and confronted his brother about

10

talking too much about the murder. He punched his brother in the jaw and told him to "shut his fucking mouth."

In 2006, Pilarski lied when interviewed by Detective Lankford with the intention of protecting himself and appellants from prosecution. In 2010, Pilarski was interviewed again by Detective Lankford and was truthful. He remained good friends with appellants throughout the trial and testified reluctantly pursuant to a subpoena.

### 3. Elissa MacGregor

In February 2008, Elissa MacGregor and Lee "Rusty" Block moved into Ralph's house. MacGregor began dating Ralph even though she knew he was still married to Cindy. Ralph told MacGregor the following details of the murder of Campanelli: Cindy acted as the lookout; he and his brother destroyed the bar to make it look like a robbery; they hid inside the bar and then jumped Campanelli and repeatedly stabbed him but "the fucking guy did not die easily"; they were not concerned about Halsworth because they knocked her out and covered her head. Ralph talked about the murder and used the phrase "gurgle, gurgle" in front of MacGregor and her friends so often that she had to ask him to stop.

Prior to his rearrest, Ralph told MacGregor he was worried about a necklace that contained his DNA that he left behind at the bar during the murder. While incarcerated he told MacGregor about a letter he kept in his safe that his brother had given Cindy. He told MacGregor to burn the letter if she found it. He also told her to tell Cindy "CRC always" which he told MacGregor meant "Chris Ralph and Cindy always." Ralph asked MacGregor to get police reports about the murder from his father and give them to their neighbor Kevin Jak's nephew, who was a San Fernando Valley gang member. The reports concerned two witnesses, "Dana" and "Caryn," and Ralph said they were both snitches. He said that Jak's nephew and another gang member would influence the witnesses not to testify. MacGregor left a copy of the police reports at Jak's house for his nephew.

11

### 4.    Caryn Wearing

Caryn Wearing worked as a bartender at Mugsy's from September 2005 until Campanelli's murder.  Ralph told her he was upset that Campanelli stopped him from becoming a partner in Mugsy's.  In early 2007, Ralph told Wearing about the murder and said he was relieved to be able to get the murder "off his chest."  He was confident Cindy would not snitch because she was his wife and she was afraid of him and his brother.  Ralph told Wearing that he was concerned about a necklace that was found at the bar.

### 5.    Dana Felton

Between June and December 2007, Dana Felton rented a room in Kevin Jak's house, which was across the street from Ralph's house.  Ralph told Felton substantially the same details about the crimes as he had told Cindy, Pilarski, Weightman, MacGregor, and Wearing.  He used the phrase "gurgle, gurgle" to describe the sound Campanelli made when dying, and also told her he was concerned about losing a necklace at the crime scene that might implicate him.

Ralph told Felton that he felt no remorse about killing Campanelli because he was a "scumbag" and he was doing society a favor by killing him.  He was confident he was going to get away with the crimes because he had been arrested and released.  He said the case was closed and he could not be arrested and prosecuted because "double-jeopardy" applied to his arrest.

### 6.    Kevin Jak

Ralph told Kevin Jak substantially the same details of the crime as he had told others.  He told Jak that they had made a mistake and someone was going to figure out that a key to Mugsy's was needed to lock the door.  He was also worried about the necklace he lost because it could connect him to the crime.

### 7.    Gary Scott Weightman

Gary Scott Weightman grew up with Ralph.  He testified that in February 2006 Ralph knocked on his door, he heard him say "fuck, fuck, fuck," and saw him walk toward his Blazer when Weightman did not answer.  In March 2006, after Ralph was

released he confessed to Weightman that he and his brother killed Campanelli. While in jail awaiting trial, Ralph told Weightman that he thought he was going to get away with the murder.

### 8.  Lee Kelley "Rusty" Block

In late 2007, Ralph told Lee Kelley Block about the murder and assault and provided the same major details as before. In 2008, Ralph spoke more frequently about the Campanelli murder and in a more casual manner. He said he was "untouchable" for the murder because he had "the Rosas luck."

*Appellants' Jailhouse Admissions*

On August 27, 2008, during a recorded jailhouse visit, Christopher told his father that Cindy was in custody in Santa Clarita. He instructed his father to tell Cindy "CRC always from Ralph and Chris and stick by it."

On September 3, 2008, appellants were recorded in a conversation together discussing Cindy. Ralph noted that Cindy had a lawyer and said, "I hope she stays true." In reference to Campanelli, Ralph whispered, "We should have mother fuckin' buried him personally." Christopher responded, "Yeah, shoulda, coulda, woulda," and added "CRC Bro."

On September 9, 2009, appellants were recorded in a conversation discussing Pilarski. Appellants were aware that Detective Lankford had found him but did not believe he would "break." Ralph suggested contacting Pilarski but Christopher said they should not because the police would use it against them.

Detective Lankford seized a number of letters appellants sent to each other while in jail. Appellants referred to each other as "bro" similar to how the killers had addressed each other during the crimes. In the letters Ralph talked about Campanelli's blood in Christopher's vehicle, Pilarski's arrest while in possession of the license plate, and references to Pilarski's gang member friend, Frost. Appellants tried to formulate a secret code using letters and numbers to avoid detection by law enforcement. Ralph explained the code in one letter to his brother and used an example to show how the code worked.

13

*Autopsy*

Dr. Raffi Djabourian, a deputy medical examiner with the Los Angeles County Coroner's Office, performed an autopsy on Campanelli's body on February 28, 2006. He found extensive blunt force trauma injuries all over the body with the most extensive to the head and face. He also found sharp force trauma resulting from a weapon or instrument like a knife going through the body. Campanelli suffered a skull fracture similar to a pedestrian struck by a car and not typically associated with a punch or a fall. The fracture was consistent with being struck in the head by a fire extinguisher. The extensive trauma Campanelli suffered likely shook his brain and resulted in significant brain swelling. One portion of the brain had swollen to the point of bulging out of the skull. There was blood in Campanelli's lungs which meant he aspirated blood instead of air into his lungs that would have made him feel like he was drowning in his own blood. There were several stab wounds to Campanelli's neck and scalp and almost all the sharp force injuries were inflicted before he died. Dr. Djabourian concluded the manner of death was homicide and the cause of death was blunt cranial facial trauma or trauma to the head and face. The multiple sharp force injuries were contributing factors to his death.

***Forensic Evidence***

LACSD senior criminalist with the sheriff's scientific services bureau, Joseph Cavaleri, examined Christopher's Chevy Blazer. He detected blood on a car seat cover found in the back of the truck and based on its wear and tear pattern determined it had been removed from the driver's side. Cavaleri also found powder residue on the steering wheel and in the interior of the vehicle. The powder residue was consistent with someone having discharged a fire extinguisher prior to driving the vehicle.

George Hou, a senior criminalist with LACSD, performed the DNA analysis in this case. He testified that the profiles of Campanelli and Christopher were found in the blood stain on the car seat cover recovered from the Chevy Blazer. He also testified that

14

the feather charm and necklace found in Mugsy's after the murder contained DNA profiles of Campanelli and Ralph.

**Defense Case**

No evidence was presented on behalf of appellants.

## DISCUSSION

**I.    Admission of Autopsy and Crime Scene Photographs**

Ralph filed a motion in limine to exclude multiple crime scene and autopsy photographs of Campanelli that were "cumulative, redundant, and thus prejudicial." The trial court reviewed the photographs and overruled Ralph's objection. Ralph contends that the trial court abused its discretion in admitting the photographs that were "extraordinarily gory and horrifying." He argues that the trial court should have excluded the photographs pursuant to Evidence Code section 352 because they were only "marginally relevant."[6]

"[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant . . . ." (*People v. Long* (1974) 38 Cal.App.3d 680, 689, fn. omitted.) "The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory." (*People v. Crittenden* (1994) 9 Cal.4th 83, 133; see also *People v. Coleman* (1988) 46 Cal.3d 749, 776.) The court's exercise of its discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. (*Crittenden, supra*, at p. 134; *People v. Lewis* (2009) 46 Cal.4th 1255, 1282.) If the photographs, though "'gruesome,'" would clarify a medical examiner's testimony, then they may be admitted in the court's discretion. (*Coleman, supra,* at p. 776.) Autopsy photographs may therefore be admitted as pertinent because they show the "'nature and placement of the fatal wounds'" or support the prosecution's theory of how

---

[6]    Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

the murders were committed or illustrate the testimony of the coroner and percipient witnesses. (*People v. Loker* (2008) 44 Cal.4th 691, 705.)

We have reviewed the photographs in question[7] and conclude the trial court did not abuse its discretion in admitting them. They accurately depicted Campanelli at the scene and at the autopsy.

The photographs were relevant to assist the jurors in understanding the medical testimony about the autopsy. (See *People v. Roldan* (2005) 35 Cal.4th 646, 713 overruled on another ground by *People v. Doolin* (2009) 45 Cal.4th 390.) Even if the photographs were cumulative to the medical testimony about the autopsy, "this . . . does not demonstrate the trial court abused its broad discretion. '[P]rosecutors . . . are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case.'" (*People v. Roldan, supra,* at p. 713.)

The photographs were also relevant to corroborate the fact and substance of Ralph's admissions to numerous witnesses. In particular, the photographs served to corroborate Cindy's testimony and rebut allegations that she lied to Detective Lankford in order to get a deal from the prosecution or because she was angry with Ralph because he lied about his marital status.

Not only were the photographs relevant and admissible under Evidence Code section 352, their admission did not violate Ralph's federal constitutional rights. (*Chapman v. California* (1967) 386 U.S. 18, 24 [error will be deemed harmless if reviewing court can conclude beyond a reasonable doubt that a rational jury would have found defendant guilty absent the error]; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

The other evidence of Ralph's guilt was overwhelming. Ralph was angry because Campanelli refused his offer to become a partner in Mugsy's and he and his brother openly discussed their plan to get rid of Campanelli. On the night of the murder, Ralph

---

**7**    Crime scene photographs (People's exhibits 7, 8, and 53–56); autopsy photographs (People's exhibits 67–72, and 74).

told Cindy that "they were going to take [Campanelli] out and kill him." Halsworth's description of the murder and assault was corroborated by Cindy who was in the back office. Furthermore, Ralph's detailed descriptions of how he committed the crimes were corroborated by Dr. Djabourian's testimony of Campanelli's injuries and the manner in which they were inflicted. In the hours immediately following the crimes both appellants discussed with Cindy their plans to destroy evidence linking them to the crimes. Christopher made plans to have his vehicle stolen and then torched. Ralph disposed of the bloody clothes they wore during the crimes. Following the crimes, Ralph confessed his involvement to Cindy, Pilarski, Weightman, MacGregor, Wearing, Felton, Jak, and Block. He often referenced the gurgling sound which Campanelli made as he choked on his own blood. He confessed to so many people and on so many occasions that Christopher confronted and ordered him to "shut his mouth." In addition to his repeated confessions, other evidence identified Ralph as the perpetrator. He had a tattoo depicting the same charm and necklace that police found at the scene and which contained his DNA. He also had a fresh abrasion to his arm when he met with Detective Lankford shortly after the murder and assault. In jailhouse communications with Christopher, Ralph expressed concern that Cindy and Pilarski would not remain loyal to him demonstrating his consciousness of guilt.

## II.    Admission of Note Shown During Jailhouse Visit

### A.    *Contention*

Ralph contends that the trial court's admission of a note that his mother held up to the glass partition during a jailhouse visit was an error that violated his right to due process.

### B.    *Background*

LACSD Deputy Michael Kelley testified that on November 15, 2008, during a jailhouse visit from appellants' parents, he confiscated a note held up to the glass partition by appellants' mother Linda Lee Rosas, for Ralph to read. The note stated:

"Neclace (*sic*)–What did you say to Lankf (*sic*).  In first interview when you were first arrested."[8]

Ralph's defense counsel moved to exclude the note.  He argued the note should be excluded as inadmissible hearsay because there was no evidence that Ralph wrote the note or responded to it such that it could be considered an adoptive admission.  He argued the note was irrelevant and Deputy Kelley's testimony should be excluded.  The prosecutor argued the note was not hearsay and was not offered for a hearsay purpose.  The note was relevant to show that Ralph and his parents had discussed the necklace and what he might have said to Detective Lankford.  The trial court overruled defense counsel's objection to the admission of the note stating:  "The court finds, under the circumstances of this case where there is evidence that a necklace was found at the scene, that there was DNA testing conducted with respect to that necklace, that [appellant] Ralph Rosas discussed the necklace with a number of people, and there was testimony in this court regarding that, that it is more probative than prejudicial.  So the [note] and the statement by the Deputy will remain."  Ralph's defense counsel made a motion for a mistrial, which was denied.

Ralph's defense counsel requested that the note be excluded when the exhibits were being discussed at the close of the evidence.  The court denied the request finding the note was "more probative than prejudicial" and that it was not hearsay because it was not being offered for the truth of the matter asserted.  With respect to the note, the parties agreed on the language for the instruction, and the trial court instructed the jury with CALJIC No. 2.09 modified as follows:  "Certain evidence was admitted for a limited purpose.  As to People's Exhibit 114 it has been admitted for a purpose other than the truth of the matter, contained in the writing itself."

---

[8]     People's exhibit 114.

18

### C. Analysis

Ralph contends the court erred by admitting the note. He contends admitting the note for a nonhearsay purpose was error because the prosecution "[attempted] to prove the truth of the matter asserted–that the 'necklace' was of concern to appellant." He further argues that the note was "completely irrelevant" and its admission was prejudicial.

With respect to hearsay, Evidence Code section 1200, subdivision (b) states: "hearsay evidence is inadmissible." Hearsay evidence is defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) We review a challenge to the admission of evidence pursuant to a hearsay exception under the deferential abuse of discretion standard of review. (*People v. Pirwani* (2004) 119 Cal.App.4th 770, 787.) A trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113; *People v. Brown* (2003) 31 Cal.4th 518, 540–541 [trial court's determination that preliminary facts exist to permit admission of a statement under an exception to the hearsay rule will not be disturbed if supported by substantial evidence].)

The note was not hearsay because it was not offered for the truth of the matter asserted therein, that is, it was not offered to establish that Ralph made a statement to Detective Lankford during his first interview after his initial arrest. The note was admitted for the limited purpose of demonstrating Ralph's consciousness of guilt. Somebody had discussed the significance of the necklace with appellant's parents and the note provided context for admissions that Ralph made to Wearing, Felton, and Jak. The hearsay objection was properly overruled.

To the extent the argument is relevance, we agree that only relevant evidence is admissible. (Evid. Code, § 350.) "'The test of relevance is whether the evidence tends

19

"logically, naturally, and by reasonable inference" to establish material facts . . . .'" (*People v. Harris* (2005) 37 Cal.4th 310, 337.) Here, there was evidence that a necklace was found at the scene of the crime, DNA testing was conducted on that necklace, and Ralph mentioned to a number of witnesses that he was worried that a necklace he lost could implicate him in the crime. Thus, the evidence was relevant.

Assuming, arguendo, that Ralph is correct and the note should not have been admitted, he failed to demonstrate that such error was prejudicial. The standard of review governing the erroneous admission of evidence is whether the error was harmless under *People v. Watson, supra,* 46 Cal.2d at p. 837. This case was not decided by the admission of the jailhouse note. The evidence of Ralph's guilt in this case, consisting of his conduct before and after the crimes, his confession to at least eight witnesses, and the recorded conversations and letters between Ralph and his brother Christopher, was overwhelming.

In light of all the other evidence in support of the two charged crimes, it is clear beyond a reasonable doubt that a rational jury would have found Ralph guilty absent the alleged error.

### III. Appellant Christopher

We appointed counsel to represent Christopher on appeal. After examination of the record, counsel filed an "Opening Brief" in which no issues were raised. On September 13, 2012, we advised Christopher that he had 30 days within which to personally submit any contentions or issues which he wished us to consider. No response has been received.

We have examined the entire record and are satisfied that Christopher's appellate counsel has fully complied with his responsibilities and that no arguable issue exists. We conclude that Christopher has, by virtue of counsel's compliance with the *Wende* procedure and our review of the record, received adequate and effective appellate review of the judgment entered against him in this case. (*Smith v. Robbins* (2000) 528 U.S. 259, 278; *People v. Kelly* (2006) 40 Cal.4th 106, 123–124.)

20

**DISPOSITION**

The judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J. *

                 FERNS

We concur:


_____, Acting P. J.

    ASHMANN-GERST


_____, J.

    CHAVEZ

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.